**ELECTRONICALLY FILED**
**COURT OF COMMON PLEAS**
**Monday, February 26, 2024 1:18:55 PM**
**CASE NUMBER: 2024 CV 01177 Docket ID: 136799486**
**Mike Foley**
**CLERK OF COURTS MONTGOMERY COUNTY OHIO**

**IN THE COMMON PLEAS COURT OF MONTGOMERY COUNTY, OHIO**
**GENERAL DIVISION**

| | |
|---|---|
| SHAWN ACHS; CHAD PURDON; LEAH PURDON; ROGER BAILEY; MARY LOU KREUSCH; KEVIN MCLAUGHLIN; ERIC HEYNE; NANCY WEISNER; MIKEL HAYS; PAMELA HAYS; JANET HAMILTON; HEATHER HOKE; JASON HOKE; DOUGLAS FINK; CATHERINE HAUSER; JAMES CARTER; DANIEL CALLAHAN; BENJAMIN JONES; and CHRISTY JONES, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| 3M COMPANY 3M Center St. Paul, Minnesota 55144 | ) ) ) ) |
| E. I. DUPONT DE NEMOURS AND COMPANY 974 Centre Road Wilmington, Delaware 19805 | ) ) ) ) Case No. _____ |
| THE CHEMOURS COMPANY 1007 Market Street Wilmington, Delaware 19899 | ) ) ) **COMPLAINT WITH JURY** |
| THE CHEMOURS COMPANY FC, LLC 1007 Market Street Wilmington, Delaware 19899 | ) **DEMAND** ) ) ) |
| DUPONT DE NEMOURS, INC. 974 Centre Road, Building 730 Wilmington, Delaware 19805 | ) ) ) ) |
| CORTEVA, INC. 974 Centre Road Wilmington, Delaware 19805 | ) ) ) ) |
| TYCO FIRE PRODUCTS LP 1400 Pennbrook Parkway Lansdale, Pennsylvania 19446 | ) ) ) ) |
| CHEMGUARD, INC. 2300 Aerial Drive Marinette, WI 54143 | ) ) ) ) |
| KIDDE PLC, INC. | ) |

9 Farm Springs Road )
Farmington, Connecticut 06032 )
)
CHUBB FIRE, LTD. )
Littleton Road, Ashford )
Middlesex, United Kingdom TW15 1TZ )
)
UTC FIRE & SECURITY AMERICAS )
CORPORATION, INC. )
13995 Pasteur Blvd. )
Palm Beach Gardens, Florida 33418 )
)
RAYTHEON TECHNOLOGIES CORPORATION )
870 Winter Street )
Waltham, Massachusetts 02451 )
)
CARRIER GLOBAL CORPORATION )
13995 Pasteur Blvd. )
Palm Beach Gardens, Florida 33418 )
)
NATIONAL FOAM, INC. )
141 Junny Road )
Angier, North Carolina 27501 )
)
BUCKEYE FIRE EQUIPMENT COMPANY )
110 Kings Road )
Mountain, North Carolina 28086 )
)
ARKEMA, INC. )
900 1st Avenue )
King of Prussia, Pennsylvania 19406 )
)
BASF CORPORATION )
100 Park Avenue )
Florham Park, New Jersey 07932 )
)
CHEMDESIGN PRODUCTS, INC. )
2 Stanton Street )
Marinette, Wisconsin 54143 )
)
DYNAX CORPORATION )
103 Fairview Park Drive )
Elmsford, New York 10523 )
)
CLARIANT CORPORATION )
4000 Monroe Road )
Charlotte, North Carolina 28205 )
)
CHEMICALS INCORPORATED )
12321 Hatcherville Road )
Baytown, Texas 77521 )

NATION FORD CHEMICAL COMPANY )
2300 Banks Street )
Fort Mill, South Carolina 29715 )
)
AGC, INC. )
1-5-1, Marunouchi, Chiyoda-ku )
Tokyo 100-8405 Japan )
)
AGC CHEMICALS AMERICAS, INC. )
55 E. Uwchlan Avenue, Suite 201 )
Exton, Pennsylvania 19341 )
)
DEEPWATER CHEMICALS, INC. )
196122 E County Road 40 )
Woodward, Oklahoma 73801 )
)
ARCHROMA MANAGEMENT, LLC )
Neuhofstrasse 11, 4153 Reinach )
Basel-Land, Switzerland )
)
ARCHROMA U.S., INC. )
5435 77 Center Dr., #10 )
Charlotte, North Carolina 28217 )
)
JOHN DOE DEFENDANTS 1-49, )
)
        Defendants. )
)
)
)
)
)
)
)
)
)
)
)
)
)
)
_____ )

## **COMPLAINT**

      Plaintiffs, by and through undersigned counsel, bring this action against

Defendants, 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), E. I. DuPont

De Nemours and Company, The Chemours Company, The Chemours Company FC,

LLC, DuPont de Nemours, Inc., Corteva, Inc., Chemguard, Inc., Tyco Fire Products LP

(individually and as successor-in-interest to The Ansul Company), Kidde PLC, Inc., Chubb Fire, Ltd., UTC Fire & Security Americas Corporation, Inc., Carrier Global Corporation, Raytheon Technologies Corporation (f/k/a United Technologies Corporation), National Foam, Inc., Buckeye Fire Equipment Company, Arkema, Inc., BASF Corporation, ChemDesign Products, Inc., Clariant Corporation, Chemicals Incorporated, Nation Ford Chemical Company, AGC Chemicals Americas, Inc., AGC, Inc. (f/k/a Asahi Glass Co., Ltd.), Deepwater Chemicals, Inc., Dynax Corporation, Archroma Management, LLC, Archroma U.S., Inc., and John Doe Defendants 1-49 (collectively, "Defendants"), and allege as follows:

## INTRODUCTION AND NATURE OF THE ACTION

1.      Plaintiffs are individuals who own real property and reside close to the Dayton International Airport in Ohio. Private drinking water wells on these properties are contaminated with per- and polyfluoroalkyl substances ("PFAS") including, but not limited to, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS"). Plaintiffs bring this action against Defendants, who manufactured aqueous film-forming foam ("AFFF"), a fire-fighting foam containing PFAS that was used at the airport. Plaintiffs contend that the use of AFFF caused the contamination of their properties and has resulted in a significantly increased risk of disease.

2.      PFOA and PFOS both are known to be toxic, persistent in the environment, not biodegrade, move easily through soil and groundwater, and pose a significant risk to human health and safety. Both are animal carcinogens and likely human carcinogens. Indeed, the United States Environmental Protection Agency ("EPA") has stated that "human epidemiology data report associations between PFOA exposure and high

cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy- induced hypertension and preeclampsia, and cancer (testicular and kidney)" and that "there is suggestive evidence of carcinogenic potential for PFOS."[1]

3.      At various times from the 1960s through today, Defendants designed, manufactured, marketed, distributed, and/or sold PFOA and/or PFOS, the chemical precursors of PFOA and/or PFOS, and/or products containing PFOA, PFOS, and/or their chemical precursors (collectively, "Fluorosurfactant Products"), and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products.

4.      At all relevant times, upon information and belief, Defendants knew, or reasonably should have known, about the inherent risks and dangers involved in the use of PFAS compounds in their products—including that both PFOA and PFOS are mobile in water, not easily biodegradable, highly persistent in the environment, and present significant and unreasonable risks to both human health and the environment. Nevertheless, Defendants made a conscious choice to manufacture, market, sale, and otherwise place Fluorosurfactant Products into the stream of commerce for decades, all while knowing PFAS compounds would be inevitably released into the environment—for instance, in the use of AFFF for fire protection, training, and response activities, even when used in the manners directed and intended by the manufacturer—and concealing their knowledge of the risks involved.

---

[1] *See* U.S. Envtl. Protection Agency ("EPA"), Office of Water Health and Ecological Criteria Division, "Health Effects Support Document for Perfluorooctanoic Acid (PFOA)," EPA Document Number: 822-R-16-003, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_hesd_final-plain.pdf (last accessed 2/6/2024); *see also* EPA, Office of Water Health and Ecological Criteria Division, "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)," EPA Document Number: 822-R-16- 002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed 2/6/2024).

5.      At all relevant times, Plaintiffs did not know, nor should they have reasonably known, of the ongoing contamination of their properties and water wells through the use of Defendants' Fluorosurfactant Products, as Defendants did not disclose the toxic nature and harmful effects of their Fluorosurfactant Products.

6.      At all relevant times, users of firefighting foam causing harm to Plaintiffs property did not know, nor should they have reasonably known, that the use of Defendants' Fluorosurfactant Products would cause harm to Plaintiffs' properties, as Defendants did not disclose the toxic nature and harmful effects of their Fluorosurfactant Products.

7.      Plaintiffs' wells, water sources, water supplies and delivery system infrastructure, including any treatment systems, are collectively referred to as "Plaintiffs' Properties" in this Complaint.

8.      Plaintiffs file this lawsuit to recover compensatory and all other damages, including but not limited to the costs of restoring and remediating contamination from their real properties and drinking water wells, past and future medical costs, costs of medical monitoring, non-economic damages, loss of earnings and future earnings, and household expenses, among others.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over Defendants because, based on information and belief, each is a corporation or other business that has sufficient minimum contacts in Ohio, or otherwise intentionally avails itself of the Ohio market either through the distribution or sale of products containing PFAS, including but not limited to PFOA and PFOS, in the State of Ohio or by having a headquarters, manufacturing, distribution, or

other facility located in Ohio so as to render the exercise of jurisdiction over it by the Ohio courts consistent with traditional notions of fair play and substantial justice.

10.     Venue is appropriate pursuant to Ohio Rules of Civil Procedure 3(C)(5) and (6) because the property, or a portion thereof, that is the subject of this claim for relief is located in Montgomery County.

## **PARTIES**

11.     Shawn Achs

    a.  Mr. Achs is an Ohio resident and owns property damaged as a result of the presence of Defendants' PFAS chemicals, including PFOA and PFOS. PFAS have been detected in well water at Mr. Achs' property at levels exceeding EPA health standards.

    b.  The harmed property includes, but is not limited to, property located at 1380 Jackson Road, Vandalia, Ohio 45377.

12.     Chad and Leah Purdon

    a.  Mr. and Mrs. Purdon are Ohio residents and own property damaged as a result of the presence of Defendants' PFAS chemicals, including PFOA and PFOS. PFAS have been detected in well water at the Purdons' property at levels exceeding EPA health standards.

    b.  The harmed property includes, but is not limited to, property located at 10558 Frederick Pike, Vandalia, Ohio 45377.

13.     Roger Bailey, individually and on behalf of Roger B. Bailey Trust.

    a.  Mr. Bailey is an Ohio resident and is trustee of Roger B. Bailey Trust, which holds in trust property damaged as a result of the presence of Defendants'

PFAS chemicals. PFAS have been detected in well water at Mr. Bailey's property.

b. The harmed property includes, but is not limited to, property located at 1269 Furnas Road, Vandalia, Ohio 45377.

14. Mary Lou Kreusch

a. Ms. Kreusch is an Ohio resident and owns property damaged as a result of the presence of Defendants' PFAS chemicals, including PFOA and PFOS. PFAS have been detected in well water at Ms. Kreusch's property at levels exceeding EPA health standards.

b. The harmed property includes, but is not limited to, property located at 10535 Frederick Pike and 10525 Frederick Pike, Vandalia, Ohio 45377.

15. Kevin McLaughlin

a. Mr. McLaughlin is an Ohio resident and owns property damaged as a result of the presence of Defendants' PFAS chemicals, including PFOA and PFOS. PFAS have been detected in well water at Mr. McLaughlin's property at levels exceeding EPA health standards.

b. The harmed property includes, but is not limited to, property located at 10525 Frederick Pike, Vandalia, Ohio 45377.

16. Eric Heyne

a. Mr. Heyne is an Ohio resident and owns property damaged as a result of the presence of Defendants' PFAS chemicals, including PFOA and PFOS. PFAS have been detected in well water at Mr. Heyne's property at levels exceeding EPA health standards.

b. The harmed property includes, but is not limited to, property located at 10661 Frederick Pike, Vandalia, Ohio 45377.

17. Nancy Weisner, individually and as Trustee of the Nancy Weisner Trust

a. Ms. Weisner is an Ohio resident and is trustee of the Nancy Weisner Trust, which holds in trust property damaged as a result of the presence of Defendants' PFAS chemicals, including PFOA and PFOS. PFAS have been detected in well water at Ms. Weisner's property at levels exceeding EPA health standards.

b. The harmed property includes, but is not limited to, property located at 9100 Frederick Pike, Dayton, Ohio 45414.

18. Mikel and Pamela Hays

a. Mr. and Mrs. Hays are Ohio residents and own property damaged as a result of the presence of Defendants' PFAS chemicals, including PFOA and PFOS. PFAS have been detected in well water at the Hays' property at levels exceeding EPA health standards.

b. The harmed property includes, but is not limited to, property located at 10244 Meeker Road, Dayton, Ohio 45414.

19. Janet Hamilton

a. Ms. Hamilton is an Ohio resident and owns property damaged as a result of the presence of Defendants' PFAS chemicals, including PFOA and PFOS. PFAS have been detected in well water at Ms. Hamilton's property at levels exceeding EPA health standards.

b. The harmed property includes, but is not limited to, property located at 1956 Jackson Road, Vandalia, Ohio 45377.

20. Heather and Jason Hoke

a. Mr. and Mrs. Hoke are Ohio residents and own property damaged as a result of the presence of Defendants' PFAS chemicals, including PFOA and PFOS. PFAS have been detected in well water at the Hokes' property at levels exceeding EPA health standards.

b. The harmed property includes, but is not limited to, property located at 11302 Kley Road, Vandalia, Ohio 45377.

21. Douglas Fink

a. Mr. Fink is an Ohio resident and owns property damaged as a result of the presence of Defendants' PFAS chemicals, including PFOA and PFOS. PFAS have been detected in well water at Mr. Fink's property at levels exceeding EPA health standards.

b. The harmed property includes, but is not limited to, property located at 1352 Jackson Road, Vandalia, Ohio 45377.

22. Catherine Hauser

a. Ms. Hauser is an Ohio resident and owns property damaged as a result of the presence of Defendants' PFAS chemicals, including PFOA and PFOS. PFAS have been detected in well water at Ms. Hauser's property at levels exceeding EPA health standards.

b. The harmed property includes, but is not limited to, property located at 8525 Dog Leg Road, Dayton, Ohio 45414.

23.     James Carter

   a.  Mr. Carter is an Ohio resident and owns property damaged as a result of the presence of Defendants' PFAS chemicals, including PFHxS and PFBS. PFAS have been detected in well water at Mr. Carter's property at levels exceeding EPA health standards.

   b.  The harmed property includes, but is not limited to, property located at 8525 Dog Leg Road, Ohio 45414.

24.     Daniel Callahan

   a.  Mr. Callahan is an Ohio resident and owns property damaged as a result of the presence of Defendants' PFAS chemicals, including PFOA and PFOS. PFAS have been detected in well water at Mr. Callahan's property at levels exceeding EPA health standards.

   b.  The harmed property includes, but is not limited to, property located at 10797 Kley Road, Vandalia, Ohio 45377.

25.     Benjamin and Christy Jones

   a.  Mr. and Mrs. Jones are Ohio residents and own property damaged as a result of the presence of Defendants' PFAS chemicals, including PFOA and PFOS. PFAS have been detected in well water at the Jones' property at levels exceeding EPA health standards.

   b.  The harmed property includes, but is not limited to, property located at 994 Antioch School Road, Vandalia, Ohio 45377.

26. Plaintiffs' Properties are located near the Dayton International Airport. Upon information and belief, Defendants' Fluorosurfactant Products were used for fire-training and fire-fighting activities at the airport.

27. Each Plaintiff has a property interest in its residential property, its water well and associated piping, and in the water it appropriates for use.

28. Upon information and belief, the following Defendants, at all times relevant to this action, designed, manufactured, formulated, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products that Defendants knew or reasonably should have known would enter and be released into the environment where they would contaminate Plaintiffs' Properties, or otherwise conducted or availed themselves of business in the State of Ohio:

    a. Defendant 3M Company ("3M"), formerly known as Minnesota Mining and Manufacturing Company, is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota. 3M manufactured Fluorosurfactant Products containing PFOA, PFOS, and/or their precursor chemicals. 3M is authorized to conduct business in Ohio.

    b. Defendant E.I. DuPont de Nemours and Company ("Old DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware. Old DuPont is registered to do business in Ohio.

    c. Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market

Street, Wilmington, Delaware. Chemours is registered to do business in Ohio.

d. Chemours was incorporated as a subsidiary of Old DuPont in February 2014. In 2015, Old DuPont spun off Chemours as a separate corporate entity to hold its "Performance Chemicals" business lines (which included PFAS and numerous products whose manufacture involved the use of PFAS), along with certain of Old DuPont's environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liability for damages and injuries arising from the manufacture and sale of PFAS and the products that contain PFAS.

e. Defendant The Chemours Company FC, LLC ("Chemours FC") is a Delaware limited liability company with its principal place of business located at 1007 Market Street Wilmington, Delaware. Chemours FC operates as a subsidiary of Chemours. Upon information and belief, Chemours FC is the successor-in-interest to DuPont Chemical Solutions Enterprise. Chemours FC is registered to do business in Ohio.

f. Defendant DuPont De Nemours, Inc. ("New DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware. Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and Old DuPont. DowDuPont, Inc. was subsequently divided into

three publicly-traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. Upon information and belief, New DuPont has contractually assumed certain of Old DuPont's environmental liabilities, including Old DuPont's PFAS liabilities. Upon information and belief, DowDuPont, Inc. and/or New DuPont have conducted business throughout the United States, including in Ohio.

g. Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware. Upon information and belief, Corteva is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have contractually assumed certain of Old DuPont's environmental liabilities, including Old DuPont's PFAS liabilities. Upon information and belief, Corteva is the parent corporation of Old DuPont. Corteva is authorized to conduct business in Ohio.

h. Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with principal offices located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania. Upon information and belief, Tyco is the successor-in-interest to The Ansul Company ("Ansul") and manufactures the Ansul brand of products. Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International, plc, an Irish public limited company. Upon information and belief, Tyco has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

i.  Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin. On information and belief, Chemguard acquired Williams Fire and Hazard Control, Inc. ("WFHC") in 2010. On information and belief, on or around July 9, 2011, Tyco acquired Chemguard and its subsidiary, WFHC. Upon information and belief, Chemguard has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

j.  Defendant Kidde PLC, Inc. ("Kidde PLC") is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut. Upon information and belief, Kidde PLC was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde PLC has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

k.  Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions including, but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Upon information and belief, Chubb has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

l.   Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC Fire & Security") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Florida. Upon information and belief, UTC Fire & Security was a division of United Technologies Corporation. Upon information and belief, UTC Fire & Security has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

m.  Defendant Raytheon Technologies Corporation ("RTC") is a Delaware corporation with its principal place of business at 870 Winter Street, Waltham, MA 02451. Upon information and belief, RTC was formerly known as United Technologies Corporation ("UTC") until in or around April 2020 (collectively, "RTC f/k/a UTC"). RTC is registered to do business in Ohio.

n.  Defendant Carrier Global Corporation is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida. On information and belief, on or around April 3, 2020, UTC completed the spin-off of one of its reportable segments into a separate publicly-traded company known as Carrier Global Corporation ("Carrier"). Carrier's operations are classified into three segments: HVAC, Refrigeration, and Fire & Security. Upon information and belief, Carrier's Fire & Security products and services are sold under brand names including Chubb and Kidde. Upon information and belief, Carrier has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

o.  Defendant National Foam, Inc. ("NF") is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, North Carolina. NF is a wholly-owned indirect subsidiary of Angus International Safety Group, Ltd. Upon information and belief, NF manufactures the Angus Fire brand of AFFF products. Upon information and belief, NF has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

p.  Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina. Buckeye is registered to do business in Ohio.

q.  Defendant Arkema, Inc. is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania. Upon information and belief, Arkema conducted and/or availed itself of doing business throughout the United States, including Ohio.

r.  Defendant BASF Corporation is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals. BASF is authorized to conduct business in Ohio.

s.  Defendant ChemDesign Products, Inc. ("CDPI") is a Delaware corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, CDPI manufactured, formulated, and/or sold Fluorosurfactant Products to certain Defendants for use in Fluorosurfactant Products. Upon information and belief, CDPI

conducted and/or availed itself of doing business throughout the United States, including in Ohio.

t.  Defendant Dynax Corporation is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York. Upon information and belief, Dynax manufactured, formulated, and/or sold Fluorosurfactant Products to certain Defendants for use in Fluorosurfactant Products. Upon information and belief, Dynax has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

u.  Defendant Clariant Corporation is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. Upon information and belief, Clariant has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

v.  Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas. Upon information and belief, Chem Inc. manufactured, formulated, and/or sold Fluorosurfactant Products to certain Defendants for use in Fluorosurfactant Products. Upon information and belief, Chem Inc. has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

w.  Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina. Upon information and belief, Nation Ford manufactured, formulated, and/or sold Fluorosurfactant Products to certain

Defendants for use in Fluorosurfactant Products. Upon information and belief, Nation Ford has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

x. Defendant AGC, Inc. ("AGC"), formerly known as Asahi Glass Co., Ltd. ("Asahi Glass"), is a Japanese corporation with its principal place of business located at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo, Japan. Upon information and belief, Asahi Glass Co., Ltd. changed its name to AGC, Inc. in 2018.

y. Defendant AGC Chemicals Americas, Inc. ("AGCCA") is a Delaware corporation with its principal place of business located at 55 E. Uwchlan Ave., Suite 201, Exton, Pennsylvania. Upon information and belief, AGCCA is a subsidiary of AGC and/or Asahi Glass. AGCCA is registered to do business in Ohio.

z. Defendant Deepwater Chemicals Company ("Deepwater") is a Delaware corporation with its principal business office at 196122 E County Road 40, Woodward, Oklahoma. Upon information and belief, Deepwater manufactured, formulated, and/or sold Fluorosurfactant Products to certain Defendants for use in Fluorosurfactant Products. Upon information and belief, Deepwater has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

aa. Defendant Archroma Management, LLC ("Archroma") is a foreign limited liability company registered in Switzerland, with a principal business address of Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

bb. Defendant Archroma U.S., Inc. ("Archroma U.S.") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina. Upon information and belief, Archroma U.S. is a subsidiary of Archroma. Upon information and belief, Archroma U.S. has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

cc. Upon information and belief, Defendants John Doe 1-49 were manufacturers and/or sellers of Fluorosurfactant Products that are responsible for the damages caused to Plaintiffs described herein. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiffs will move for leave of this Court to add those individuals to the Complaint as Defendants.

29. All of the foregoing Defendants, upon information and belief, have previously conducted and/or currently conduct their business throughout the United States. Moreover, some of the foregoing Defendants, if not all, have conducted and/or are currently conducting business in the state of Ohio.

30. Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendant.

31. When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents,

employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## FACTUAL ALLEGATIONS
## COMMON TO ALL PLAINTIFFS AND CLASS MEMBERS

### A.    THE CONTAMINANTS

32.      PFOA and PFOS are toxic, persistent, man-made chemicals within a class known as perfluoroalkyl acid ("PFAA"). PFAAs are part of the larger chemical family known as PFAS. PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which is a reason why these molecules are so persistent. PFOA contains eight carbon-fluorine bonds, which is why it is sometimes referred to as "C8."

33.      PFAAs are sometimes described as long-chain and short-chain, depending on the number of carbon atoms contained in the carbon chain. PFOA is considered a long-chain PFAAs because it contains eight carbon atoms in their chains; short-chain PFAAs have six or less carbon atoms in their chains.

34.      PFOA and PFOS are highly water soluble, which increases the rate at which they spread throughout the environment, contaminating soil, groundwater, and surface water.  Their mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.[2]

---

[2]      EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R-16-005 (May 2016) at 16; and Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 16.

35.     PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver.  They have been found globally in water, soil, air, as well as in human food supplies, breast milk, umbilical cord blood, and human serum.[3]

36.     PFOA and PFOS are persistent in the human body. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[4]

37.     Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOA and PFOS.

38.     According to the United States Environmental Protection Agency ("EPA"), "…studies indicate that exposure to PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."[5]

39.     EPA has also warned that "there is suggestive evidence of carcinogenic potential for PFOS.[6]

---

[3]     EPA Document Number: 822-R-16-005 (May 2016) at 18-20, 25-27; and EPA Document Number: 822-R-16-004 (May 2016) at 19-21, 26 28.

[4]     EPA Doc. Number: 822-R-16-005 (May 2016) at 55; and EPA Doc. Number: 822-R-16-004 (May 2016) at 55.

[5]     "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Doc. Number: 800-F-16-003, available                                                                                      at https://www.epa.gov/sites/default/files/201606/documents/drinkingwaterhealthadvisories_pfoa_pfos_updated_5.31.16.pdf (last accessed 2/6/2024).

[6]     "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)" U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, EPA Document Number: 822-R-16-002, available at  https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed 2/6/2024).

40.     EPA has noted that drinking water can be an additional source of PFOA and PFOS in the body in communities where these chemicals have contaminated water supplies. In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example…an airfield at which [Fluorosurfactant Products] were used for firefighting."[7]

41.     In 2016, EPA issued Health Advisory Levels of 70 parts per trillion ("ppt") for PFOA and PFOS found in drinking water. When both PFOA and PFOS are found in drinking water, the combined concentrations should not exceed 70 ppt.

42.     In June 2022, after evaluating over 400 studies published since 2016 and applying human health risk assessment approaches, tools, and models, EPA concluded that the new data indicates that the levels of PFOA and/or PFOS exposure at which negative outcomes could occur are much lower than previously understood when the agency issued its 2016 HAs for PFOA and PFOS of 70 ppt. On June 15, 2022, EPA issued interim, updated drinking water health advisories of 0.004 ppt for PFOA and 0.02 ppt for PFOS that replace those EPA issued in 2016.[8]

43.     On March 14, 2023, EPA announced proposed National Primary Drinking Water Regulations to establish legally enforceable levels, called Maximum Contaminant Levels ("MCLs"), for six PFAS known to occur in drinking water: PFOA, PFOS, perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide dimer acid (commonly

---

[7]     "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Doc. Number: 800-F-16-003, available                                                                                                      at https://www.epa.gov/sites/default/files/201606/documents/drinkingwaterhealthadvisories_pfoa_pfos_updated_5.31.16.pdf (last accessed 2/6/2024).

[8]     "Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX chemicals, and PFBS)," EPA 822-F-22-002, available at https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan (last accessed 2/6/2024).

known as "GenX"), perfluorohexane sulfonic acid ("PFHxS"), and perfluorobutane sulfonic acid ("PFBS").[9]

44.    EPA is proposing individual MCLs of 4.0 ppt for PFOA and PFOS, and is proposing to regulate PFNA, HFPO-DA, PFHxS, and PFBS as a mixture, through an approach called a Hazard Index.[10]

**B.    DEFENDANTS' FLUOROSURFACTANT PRODUCTS**

45.    PFOA, PFOS, and their chemical precursors are used to make a variety of consumer and industrial goods sold, supplied, used, and disposed of in the State of Ohio, including but not limited to nonstick cookware, waterproofing waxes, stain-preventing coatings, and AFFF.

46.    The Fluorosurfactant Products designed, manufactured, marketed, distributed, and/or sold by Defendants contained PFOA, PFOS, and/or their chemical precursors.

47.    When used as the Defendants intended and directed, Defendants' Fluorosurfactant Products release PFAS, including PFOA, PFOS, and/or their chemical precursors, into the environment.

48.    Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions, and are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, sediment, surface water and groundwater.

---

[9] EPA, "Fact Sheet: EPA's Proposal to Limit PFAS in Drinking Water March 2023," available at https://www.epa.gov/system/files/documents/2023-04/Fact%20Sheet_PFAS_NPWDR_Final_4.4.23.pdf (last accessed 2/6/2024).
[10] *Id.*

49.     The use of Defendants' Fluorosurfactant Products as directed and intended by the Defendants allowed PFOA, PFOS, and/or their chemical precursors to enter the environment where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the soil, sediment, groundwater, and surface water, including Plaintiffs' Properties, thereby causing extensive and ongoing damage to Plaintiffs and Plaintiffs' Properties.

50.     Due to the chemicals' persistent nature, among other things, these chemicals have and continue to cause injury and damage to Plaintiffs and Plaintiffs' Properties.

## C.     AQUEOUS FILM-FORMING FOAM (AFFF)

51.     AFFF is a water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports, among other places.

52.     Generally, AFFF is used to extinguish fires, particularly fires that involve petroleum or other flammable liquids. AFFF is typically sprayed directly onto a fire, where it then works by coating the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

53.     The AFFF products made by Defendants during the relevant time period contained PFOA, PFOS, and/or their chemical precursors.

54.     AFFF produced, marketed, and/or sold by 3M was the only AFFF produced from fluorochemicals manufactured through electrochemical fluorination ("ECF"), a process that generates PFOS.  PFHxS is also produced during this process.  All other Defendants used telomerization to produce AFFF.  Fluorochemicals synthesized through telomerization degrade into PFOA, but not PFOS.

55.     When used as the Defendants intended and directed, the AFFF manufactured and/or sold by the Defendants released PFOA, PFOS, and/or their chemical precursors into the environment.

56.     Notably, AFFF can be made without PFOA, PFOS, and/or their chemical precursors. As such, fluorine-free foams do not release PFOA and/or PFOS into the environment.

57.     Despite having knowledge of this fact—as well as having knowledge regarding the toxic nature of AFFF made with PFOA, PFOS, and/or their chemical precursors—Defendants continued to manufacture, distribute and/or sell AFFF with PFOA, PFOS, and/or their chemical precursors, which has ultimately led to the ongoing contamination and damages to Plaintiffs' Properties.

58.     Defendants' Fluorosurfactant Products have been used for their intended purposes in the process of fire protection, training, and response activities within Connecticut for many years. During these activities, Defendants' Fluorosurfactant Products were used as directed and intended by the manufacturer, which allowed PFOA and PFOS to migrate through the subsurface and into the groundwater, enter into Plaintiffs' Properties, thereby contaminating Plaintiffs' wells and causing extensive and ongoing damage, as well as s to Plaintiffs' Properties.

59.     Due to the chemicals' persistent nature, among other things, these chemicals have caused, and continue to cause, significant injury and damage to Plaintiffs and Plaintiffs' Properties.

## D. DEFENDANTS' KNOWLEDGE AND CONCEALMENT OF PFOA/PFOS HAZARDS

60.     On information and belief, by the 1970s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed or otherwise released in the open environment, per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with surface water and groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from drinking water supplies only at substantial expense.

61.     At all times pertinent herein, Defendants also knew or should have known that PFOA and PFOS present a risk to human health and could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

62.     In 1980, 3M published data in peer-reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[11]

63.     By the early 1980's, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

---

[11]     Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

64.      In 1981, Old DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. Old DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects – one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[12]

65.      Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memorandum, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[13]

66.      Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS. Some of 3M's PFOS-based productions, such as its AFFF production, did not fully phase out until 2002.

67.      From 1951, Old DuPont, and on information and belief, Chemours, designed, manufactured, marketed and sold Fluorosurfactant Products, including Teflon nonstick cookware, and more recently PFAS feedstocks such as Forafac 1157 and Forafac 1157N, for use in the manufacturing of various Fluorosurfactant Products.

68.      On information and belief, in 2001 or earlier, Old DuPont manufactured, produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks to

---

[12]      Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

[13]      Memorandum "Organic Fluorine Levels," August 31, 1984, available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

some or all of the Defendants for use in their Fluorosurfactant Products that were discharged into the environment and contaminated Plaintiffs' Properties.

69.     Old DuPont had been studying the potential toxicity of PFOA since at least the 1960's and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[14]

70.     By December 2005, the EPA uncovered evidence that Old DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History."[15] The EPA fined Old DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."[16]

71.     By July 2011, Old DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over Old DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified Old DuPont of a "probable link" between PFOA exposure and the serious (and potentially fatal) conditions

---

[14]     *Id.*, Fred Biddle, "DuPont confronted over chemical's safety," Wilmington News Journal (Apr. 13, 2003). The Wilmington News Journal is published in Wilmington, Ohio.

[15]     $16.5 million.

[16]     U.S. Environmental Protection Agency, Reference News Release, "EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History" (Dec. 14, 2005), https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental (last viewed January 30, 2018).

of pregnancy-induced hypertension and preeclampsia.[17],[18] By October 2012, the C8 Science Panel had notified Old DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

72.     In July 2015, Old DuPont spun off its chemicals division by creating Chemours as a new publicly-traded company, once wholly-owned by Old DuPont. By mid-2015, Old DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

73.     Notwithstanding this knowledge, Defendants negligently and carelessly: (a) designed, manufactured, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of (namely, by washing the foam into the soil or wastewater system), thus improperly permitting PFOA, PFOS, and/or their precursor chemicals to contaminate Plaintiffs' Properties; (c) failed to recall and/or warn the users of Fluorosurfactant Products, negligently-designed products containing or degrading into PFOA and PFOS, of the dangers of surface water, soil, sediment, and groundwater contamination as a result of standard use and disposal of these Products; and (d) further failed and refused to issue the appropriate warnings and/or recalls to the users of Fluorosurfactant Products, notwithstanding the

---

[17]     Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease.

[18]     The C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011), http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf (last viewed January 28, 2018).

fact that Defendants knew or could reasonably ascertain the identities of the purchasers of their Fluorosurfactant Products.

74. Defendants had a duty and breached their duty to evaluate and test such Fluorosurfactant Products adequately and thoroughly to determine their potential human health and environmental impacts before they sold such products. Defendants also had a duty and breached their duty to minimize the environmental harms caused by Fluorosurfactant Products. Moreover, Defendants failed to warn Plaintiffs of the known risks for environmental and health hazards arising from the usage of Defendants' Fluorosurfactant Products in their intended manner for their intended purpose.

75. Defendants knowingly concealed material facts, including but not limited to: the toxicity of Fluorosurfactant Products, that Fluorosurfactant Products persist for long periods of time in the environment, and that the use of Fluorosurfactant Products could lead to contamination of nearby groundwater wells. Defendants concealed these facts while actively promoting the use of their products for uses that would cause water contamination; for example, Defendants' encouraged use of their product when training. Defendants concealed these facts to allow for continued sale and use of its products. Defendants intended for their actions to encourage users of their products to use Fluorosurfactant Products in ways that led directly to PFAS entering the environment, including surface water and groundwater. The users of Defendants' products – including those who used AFFF leading to contamination of Plaintiffs' properties – relied on Defendants various representations. In addition, Plaintiffs have relied of Defendants' various representations – including but not limited to representations regarding the toxicity of PFAS. As a result of these representations, Plaintiffs have been harmed.

76.     As a direct and proximate result of Defendants' actions and/or inactions alleged in this Complaint, Plaintiffs' Properties have been contaminated, and will continue to be contaminated, with PFAS, including PFOA and PFOS, creating an environmental hazard, unless such contamination is remediated. As a direct and proximate result of Defendants' actions and/or inactions, Plaintiffs must assess, evaluate, investigate, monitor, treat, filtrate, remove, clean up, correct, and/or remediate PFAS contamination of their Properties at significant expense, loss and damage to Plaintiffs.

**E.    OLD DUPONT'S FRAUDULENT PLANS TO SHIELD ITS ASSETS FROM ITS PFAS LIABILITIES**

77.     By 2013, Old DuPont faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFOA and/or its chemical precursors throughout the country. These liabilities included, among other things, clean-up costs, remediation obligations, tort damages, natural resources damages, and potential punitive damages.

78.     Upon information and belief, by 2013, in order to shield its assets from these liabilities and make itself a more appealing merger partner, Old DuPont began to consider and/or engage in a complex series of corporate restructurings and spin-offs.

79.     In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) to Chemours.

80.     At the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liabilities for damages and

injuries arising from its manufacture and sale of its PFAS products, including PFOA and its chemical precursors.

81.     Upon information and belief, prior to the spinoff, Chemours was a wholly-owned subsidiary of Old DuPont and its four-member Board of Directors consisted of three Old DuPont employees and a former member of Old DuPont's Board of Directors. Then, effective immediately prior to the spinoff, the Chemours Board of Directors doubled in size, the three Old DuPont employees resigned, and seven new members were appointed to fill the vacancies. This new Chemours Board of Directors did not take part in negotiating the Separation Agreement.

82.     In or around July 1, 2015, Old DuPont completed the spin-off Chemours as a separate public entity and saddled Chemours with Old DuPont's massive PFAS liabilities.

83.     Although many of the details of the Separation Agreement remain largely hidden from the public, upon information and belief, as part of the Separation Agreement, Chemours accepted broad assumption of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, discharge, marketing, distribution, and sale of PFAS.

84.     Additionally, Chemours agreed to assume for itself and indemnify Old DuPont against all liabilities relating to or arising from the operation of the Performance Chemicals business at any time and regardless of which entity is named in any action or against whom such liabilities are asserted or determined.

85.     Further, Chemours agreed to assume for itself and indemnify Old DuPont from all environmental liabilities that arose prior to the spinoff if Old DuPont reasonably

determined that 50.1% of the liabilities were attributable to the Performance Chemicals business.

86.     Upon information and belief, the value of the assets Chemours transferred to Old DuPont was substantially more than the value of the assets it received from Old DuPont, and Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

87.     Old DuPont knew that Chemours was undercapitalized and unable to satisfy the massive liabilities that it assumed from Old DuPont. In addition to the assumption of such liabilities, Chemours was required to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

88.     In or around December 2015, Old DuPont entered into an agreement with Dow, Inc. ("Old Dow") pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created solely for the purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

89.     Following its creation, DowDuPont engaged in a number of realignments and divestitures, the details of which remain largely hidden from Plaintiffs and other creditors, intended to frustrate and/or hinder creditors with claims against Old DuPont. Upon information and belief, the net effect of these transactions was the transfer, directly or indirectly, of a substantial portion of Old DuPont's assets to DowDuPont for far less than these assets were worth.

90. By 2019, DowDuPont spun-off two new publicly traded companies, Corteva, Inc. and Dow, Inc. ("New Dow"). DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

91. Upon information and belief, Corteva currently holds Old DuPont as a subsidiary.

92. Upon information and belief, as part of the DowDuPont Separation Agreement, Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science, or Specialty Products Businesses, including the PFAS liabilities which are allocated on a pro rata basis between Corteva and New DuPont.

## F. THE IMPACTS OF PFAS ON PLAINTIFFS AND CLASS MEMBERS

93. As discussed above, Plaintiffs own real properties and private drinking water wells affected by PFAS contamination.

94. Plaintiffs have been regularly exposed to PFAS compounds.

95. Defendants' PFAS have caused contamination in Plaintiffs' wells. In addition, Plaintiffs are now at a significantly increased risk of adverse health effects linked to PFAS exposure.

96. The detection and/or presence of PFAS, and the threat of further detection and/or presence of PFAS, on Plaintiffs' Properties has resulted, and will continue to result, in significant injury and damage to Plaintiffs.

97. The invasion of Plaintiffs' Properties with PFAS is continuous and recurring, as new contamination flows regularly and constantly into Plaintiffs' Properties each day—

the result of which is a new harm to each Plaintiff and its property in each and every occurrence.

98.     The injuries to Plaintiffs caused by Defendants' conduct constitute an unreasonable interference with, and damage to, Plaintiffs' property, including but not limited to the limited subterranean and surficial supplies of fresh drinking water on which Plaintiffs' wells depend.

99.     A stigma attaches to Plaintiffs' properties due to PFAS contamination in the area surrounding Plaintiffs' properties, causing a reduction of value of Plaintiffs' properties.

100.     Plaintiffs' exposure to PFAS has occurred, and continues to occur, on a daily basis.  Exposure constitutes physical injury to each Plaintiff.

101.     Through this action, Plaintiffs seek to recover damages (including but not limited to compensatory, punitive, and/or consequential damages) arising from the ongoing contamination of Plaintiffs' Properties by Defendants' Fluorosurfactant Products. Such damages moreover include, but are not limited to, the past and future costs of restoring and remediating contamination from their real properties and drinking water wells, but also past and future medical costs, costs of medical monitoring, loss of earnings, and household expenses, among others.

## CLASS ACTION ALLEGATIONS

102.     Plaintiffs and Class Members have all suffered injury in fact as a result of the presence of PFAS in the drinking water supplied to the Plaintiffs' properties as a result of Defendants' unlawful conduct.

103.    Plaintiffs bring this lawsuit on behalf of themselves and all other individuals that are similarly situated.

104.    There are two proposed class subgroups with Class Definitions as follows:

a.  Class Subgroup 1: "All who have an interest in real property where PFAS has been detected in a drinking water well as a result of AFFF use at Dayton International Airport."

b.  Class Subgroup 2: "All who have, at anytime during 2019 or later, resided at a property where PFAS has been detected in a drinking water well as a result of AFFF use at Dayton International Airport."

105.    Excluded from the putative class are Defendants and their officers, directors, and employees. Plaintiffs reserve the right to modify or amend the Class Definition before the Court determines whether certification is appropriate.

106.    Plaintiffs residing at a property where PFAS has been detected in a drinking water well as a result of AFFF use at Dayton International Airport have suffered a significantly increased risk of serious injury and diseases, including among other diseases, kidney cancer, testicular cancer, ulcerative colitis, pregnancy-induced hypertension, thyroid disease, and high cholesterol.

107.    Ascertainability. The members of the Class are readily ascertainable by reference to public property records and Plaintiffs' personal and employment records.

108.    Numerosity. The members of the Class are so numerous that their individual joinder is impracticable.  Upon information and belief, there are over 100 putative Class Members.

109.     Existence and predominance of Common Questions of Law and Fact. Common questions of law and fact that exist as to all members of the Class predominate over any questions affecting only individual class members. All members of the Class have been subject to the same conduct and suffer injuries as a result. Questions of law or fact which are common to the Class, as set forth in this Complaint, predominate over questions affecting individual members because class members are similarly situated victims of Defendants' common course of conduct.  Defendants' conduct similarly harmed all Class Members because Defendants designed, manufactured, promoted, and sold AFFF and other Fluorosurfactant Products used in the vicinity of Plaintiffs' Properties.  In addition, Defendants have no defenses specific to individual Class Members, and Defendants' defenses, if any, apply equally to all Class Members.  The common legal and factual questions include, but are not limited to, the following:

    a.  whether AFFF, when used as intended, is unreasonably dangerous;

    b.  whether AFFF, when used as intended, contaminate nearby properties and private wells;

    c.  whether Defendants could have reasonably foreseen that AFFF products, when used as intended, would contaminate nearby properties and private wells;

    d.  whether Defendants could have reasonably foreseen that AFFF, when used as intended, would cause injurious exposure to individuals who own, reside, work, and visit those properties and/or consume or use water supplied by private wells on those properties;

e.  whether the presence of AFFF on properties and in private wells constitutes a public nuisance;

f.  whether Defendants owed Plaintiffs and Class Members a duty to ensure that their AFFF products, when used as intended, did not contaminate nearby properties and private wells;

g.  whether Defendants owed Plaintiffs and Class Members a duty to warn about hazards associated with AFFF when used as intended;

h.  whether Defendants owed Plaintiffs and Class Members a duty to warn about AFFF's propensity to expose individuals to PFAS through contamination of properties and private wells;

i.  whether Defendants breached their duties;

j.  whether Defendants' actions directly and proximately caused Plaintiffs' and Class Members' injuries and damages; and

k.  whether Defendants' conduct supports an award of punitive damages.

110.    **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class in that Plaintiffs are members of the Class that Plaintiffs seek to represent. Plaintiffs own properties contaminated with PFAS and have been exposed to  PFAS.

111.    **Adequacy of Representation.** Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in litigating environmental torts, products liability, personal injury, and class actions. Plaintiffs have no adverse or antagonistic interests to those in the Class and will fairly and adequately protect the interests of the Class.  Plaintiffs' attorneys are aware of no interests adverse or antagonistic to those of the Plaintiffs and proposed Class.

112. Superiority. A class action is superior to any other theoretically available method for the fair and efficient adjudication of this controversy. Significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigation of essentially identical issues on a class-wide rather than a repetitive individual basis. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendants. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. No unusual difficulties are likely to be encountered in the management of this class action, and concentrating the litigation in a single forum is particularly convenient to the parties.

## FIRST CAUSE OF ACTION
### Public Nuisance

113. Plaintiffs and Class reallege and reaffirm all allegations set forth in the preceding paragraphs as if fully restated herein.

114. Defendants manufactured, distributed, marketed, and promoted PFAS-containing products including AFFF in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of Plaintiffs' Properties.

115. The presence of PFAS interferes with the use of Plaintiffs' Properties – and that of the properties where Class members reside – as a source of drinking water supply.

116.     The presence of PFAS causes significant costs, inconvenience, and annoyance to Plaintiffs and Class, who rely upon private drinking water wells for potable drinking water.

117.     The presence of PFAS in well water has caused Plaintiffs and Class members to be subject to a significantly increased risk of disease.

118.     The condition affects a substantial number of people in the community who rely upon private drinking water wells for residential, commercial, and recreational purposes and interferes with the rights of the public at large to clean and safe drinking water resources and environment.

119.     An ordinary person would be reasonably annoyed or disturbed by the presence in drinking water of toxic PFAS that endanger human health and degrade water quality.

120.     The seriousness of the environmental and human health risk far outweighs any social utility of Defendants' conduct in manufacturing PFAS and PFAS-containing products and concealing the dangers posed to human health and the environment.

121.     Plaintiffs and Class members have suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and Plaintiffs and class members have incurred or will incur substantial costs to remove PFAS from their properties and water wells.

122.     Plaintiffs and Class members did not consent to the conduct that resulted in the contamination of Plaintiffs' and Class members' Properties.

123.     Defendants' conduct was a substantial factor in causing the harm to Plaintiffs and Class members.

124.     Defendants knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PFAS-containing products was causing the type of contamination now found in and around Plaintiffs' Properties and that of Class members. Defendants knew that PFAS would contaminate water supplies and are associated with serious illnesses and cancers in humans. Defendants thus knew, or should have known, that PFAS contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of private water supply wells.

125.     Defendants committed each of the above-described acts and/or omissions knowingly, willfully, and with oppression, fraud, and/or malice. Defendants' acts and/or omissions were performed to promote sales of their Fluorosurfactant Products and with conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and on public health, safety, and welfare.

126.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered, and continue to suffer, damages to be proven at trial.

## SECOND CAUSE OF ACTION
### Private Nuisance

127.     Plaintiffs and Class members reallege and reaffirm all allegations set forth in the preceding paragraphs as if fully restated herein.

128.     Plaintiffs' and Class members' properties have been contaminated by PFAS as a direct and proximate result of the acts and omissions of Defendants as set forth above.

129.     PFAS contamination is a substantial and unreasonable interference with the use of Plaintiffs' and Class members' properties and, specifically, with the use of private

wells to provide potable drinking water. The chemicals contaminate Plaintiffs' and Class members' properties and threaten the health of everyone in the community who relies upon the contaminated wells for potable water.

130. PFAS contamination caused by Defendants' conduct has damaged Plaintiffs' and Class members' properties and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiffs' and Class members' properties.

131. The presence of PFAS in well water has caused Plaintiffs and Class members to be subject to a significantly increased risk of disease.

132. Plaintiffs did not consent to the conduct that resulted in the contamination of Plaintiffs' and Class members' properties.

133. Defendants' conduct was a substantial factor in causing the harm to Plaintiffs and Class members.

134. Defendants knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PFAS-containing products was causing the type of contamination now found in and around Plaintiffs' and Class members' properties. Defendants knew that PFAS would contaminate water supplies and are associated with serious illnesses and cancers in humans. Defendants thus knew, or should have known, that PFAS contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of private water supply wells.

135. Defendants committed each of the above-described acts and/or omissions knowingly, willfully, and with oppression, fraud, and/or malice. Defendants' acts and/or omissions were performed to promote sales of their Fluorosurfactant Products and with conscious disregard to the probable dangerous consequences of that conduct and its

reasonably foreseeable impacts on the environment and on public health, safety, and welfare.

136.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered, and continue to suffer, damages to be proven at trial.

## THIRD CAUSE OF ACTION
### Products Liability – Design Defect (Ohio Rev. Code § 2307.75)

137.     Plaintiffs and Class members reallege and reaffirm all allegations set forth in the preceding paragraphs as if fully restated herein.

138.     Plaintiffs and Class members were harmed by PFAS-containing products including AFFF which were designed, manufactured, sold, and distributed by Defendants, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

139.     Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing, marketing, and selling Fluorosurfactant Products.

140.     As commercial designers, manufacturers, distributors, suppliers, sellers, and/or marketers of Fluorosurfactant Products, Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

141.     The design of Defendants' Fluorosurfactant Products was defective because, at the time of manufacture, Defendant acted unreasonably in designing or formulating the product, and this conduct was a proximate cause of the Plaintiffs' and Class members' harm. At the time of manufacturing, Defendants knew that the chosen formulation(s) of Fluorosurfactant Products was not biodegradable, would bioaccumulate in humans and wildlife, and was toxic to humans and the environment.

142. In addition, at the time the products left Defendants' control, each Defendant unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation that could then have been reasonably adopted and that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

143. Moreover, at the time the product left Defendants' control, the design or formulation of the product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design.

144. As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and/or marketers of Fluorosurfactant Products, Defendants owed a duty to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, including Plaintiffs and Class members, not to manufacture, sell, or market any product which is unreasonably dangerous for its intended and foreseeable uses.

145. Plaintiffs and Class members have been harmed as a result of the Defendants' design of their Fluorosurfactant Products.

146. The design of Defendants' Fluorosurfactant Products was a substantial factor in causing harm to Plaintiffs and Class members .

147. At all times relevant herein, the foreseeable risks associated with the design or formulation of Defendants' Fluorosurfactant Products exceeded the benefits associated with their design or formulation. These risks were foreseeable at the time the Fluorosurfactant Products left the control of the manufacturer(s).

148. At the time of manufacture, there were safer alternative designs that were practical, feasible, cost effective, and advantageous, including not using PFOA, PFOS,

and/or their precursor chemicals in their Fluorosurfactant Products. These practical and technically feasible alternative designs or formulations were available at the time the Fluorosurfactant Products left the manufacturer(s) and would have prevented the harm caused to Plaintiffs and Class members without substantially impairing the usefulness or intended purpose of the products.

149.    Plaintiffs and Class members were, are, and will continue to be harmed by Defendants' defectively designed Fluorosurfactant Products.

150.    The design of Defendants' Fluorosurfactant Products was a substantial factor in causing harm to Plaintiffs and Class members.

151.    The gravity of the environmental harm resulting from Defendants' Fluorosurfactant Products was, is, and will be enormous because PFAS contamination is widespread, persistent and toxic.

152.    The likelihood that this harm would occur was, is, and will be very high because Defendants knew and/or should have known that Defendants' Fluorosurfactant Products were toxic, could not be contained, and do not readily degrade in the environment.

153.    Defendants committed each of the above-described acts and/or omissions knowingly, willfully, and with oppression, fraud, and/or malice. Defendants' acts and/or omissions were performed to promote sales of their Fluorosurfactant Products and with conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and on public health, safety, and welfare.

154.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered, and continue to suffer, damages to be proven at trial.

## **FOURTH CAUSE OF ACTION**
### **Products Liability – Failure to Warn (Ohio Rev. Code § 2307.76)**

155.     Plaintiffs and Class members reallege and reaffirm all allegations set forth in the preceding paragraphs as if fully restated herein.

156.     Defendants were engaged in the business of researching, designing, manufacturing, formulating, testing, distributing, marketing and/or selling Fluorosurfactant Products.

157.     As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and/or marketers of Fluorosurfactant Products, Defendants had a duty to issue warnings to Plaintiffs and Class members, public officials, purchasers, downstream handlers, and/or the general public of the risks posed by their Fluorosurfactant Products.

158.     Defendants knew, or in the exercise of ordinary care should have known, that their Fluorosurfactant Products would be purchased, transported, stored, handled, and used without notice of the hazards that PFAS pose to human health and the environment.

159.     Defendants breached their duty to warn by unreasonably failing to provide Plaintiffs and Class members, public officials, purchasers, downstream handlers, and/or the general public with warnings about the potential and/or actual threat to human health and contamination of the environment by PFAS, despite Defendants' knowledge that PFAS are a real and potential threat to the environment and human health.

160.     The potential environmental hazard and toxicity risks of Defendants' Fluorosurfactant Products were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light

of Defendants' superior knowledge about their Fluorosurfactant Products at the time of design, manufacture, sale, and distribution.

161.    Defendants knew they were providing inadequate warnings and/or instructions about the inherent danger of allowing their Fluorosurfactant Products to be dispersed into the environment whereby through runoff or permeation through the ground PFAS, including PFOS and PFOA, would foreseeably infiltrate soil, surface water, and groundwater resources, including Plaintiffs' water supplies.

162.    The potential environmental hazard and toxicity risks presented an unreasonably dangerous condition when Defendants' Fluorosurfactant Products were and are used or misused in an intended or reasonably foreseeable way and without substantial changes in the condition in which they were sold, and Defendants knew that this condition posed a substantial risk of harm to reasonably foreseeable users and bystanders including property owners like Plaintiffs.

163.    The risks of PFAS are not a matter of common knowledge. Ordinary consumers and third parties would not have recognized the potential risks.

164.    Despite Defendants' knowledge of the known and/or foreseeable environmental and human health hazards associated with the use and/or disposal of Defendants' Fluorosurfactant Products, including contamination of Plaintiffs' and Class members' Properties with PFOA, PFOS, and/or their precursor chemicals, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

165.    Defendants failed to act as reasonable manufacturers when presenting their Fluorosurfactant Products to the public. In particular, Defendants failed to take reasonable

precautions such as describing such hazards, or providing any precautionary statements regarding such hazards, in the labeling of their Fluorosurfactant Products.

166.    Plaintiffs and Class members were, are, and will continue to be, harmed by Defendants' Fluorosurfactant Products.

167.    The lack of sufficient instructions or warnings was a substantial factor in causing Plaintiffs' and Class members' harm.

168.    Defendants committed each of the above-described acts and/or omissions knowingly, willfully, and with oppression, fraud, and/or malice. Defendants' acts and/or omissions were performed to promote sales of their Fluorosurfactant Products and with conscious disregard of the probable dangerous consequences of their conduct and its reasonably foreseeable impacts on the environment and on public health, safety, and welfare.

169.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered, and continue to suffer, monetary damages to be proven at trial.

## FIFTH CAUSE OF ACTION
### Trespass

170.    Plaintiffs and Class members reallege and reaffirm all allegations set forth in the preceding paragraphs as if fully restated herein.

171.    Plaintiffs and Class members own real property including private wells. Each Plaintiff and class member has significant property interests in its real property as well as in the water it appropriates and uses.

172.    Defendants intentionally, recklessly, and negligently caused PFAS to enter into the real properties and drinking water wells owned by Plaintiffs.

173. The contamination of Plaintiffs' and Class members' Properties has varied over time and has not yet ceased. PFAS continue to migrate into and enter Plaintiffs' Properties. The contamination is reasonably abatable.

174. Plaintiffs and Class members have not consented to, and do not consent to, this trespass.

175. Defendants knew or reasonably should have known that Plaintiffs and Class members would not consent to this trespass.

176. Defendants' conduct proximately caused Plaintiffs' and Class members' harm

177. Plaintiffs and Class members are, were, and will continue to be harmed by this trespass.

178. Defendants committed each of the above-described acts and/or omissions knowingly, willfully, and with oppression, fraud, and/or malice. Defendants' acts and/or omissions were performed to promote sales of their Fluorosurfactant Products and with conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and on public health, safety, and welfare.

179. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered, and continue to suffer, monetary damages to be proven at trial.

## SIXTH CAUSE OF ACTION
### Negligence

180. Plaintiffs and Class members reallege and reaffirm all allegations set forth in the preceding paragraphs as if fully restated herein.

181. As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and/or marketers of Fluorosurfactant Products, Defendants owed a duty to

Plaintiffs and Class members, as well as to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, to exercise due care in the instructing, labeling, and warning of the handling, control, use, and disposal of Defendants' Fluorosurfactant Products.

182.    Defendants were negligent by not using reasonable care to warn or instruct about the risks associated with their Fluorosurfactant Products.

183.    Despite the fact that Defendants knew that PFAS – including PFOA and PFOS -- are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants negligently: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of, thus improperly permitting PFOA, PFOS, and/or their precursor chemicals to enter and contaminate Plaintiffs' Properties; (c) failed to recall and/or warn the users of Fluorosurfactant Products of the dangers of soil and water contamination as a result of standard use and disposal of these Products; and (d) failed and refused to issue the appropriate warnings and/or recalls to the users of Fluorosurfactant Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identities of the purchasers of their Fluorosurfactant Products.

184.    Defendants knew or reasonably should have known that users and third parties would not realize the dangers.

185.    Plaintiffs and Class members were foreseeable victims of the harm caused by Defendants' Fluorosurfactant Products.

186.     Defendants failed to exercise reasonable case to prevent their Fluorosurfactant Products from presenting an unreasonable risk to human health and failed to exercise reasonable case to prevent contamination of drinking water supplies.

187.     A reasonable chemical manufacturer, seller, distributor, under the same or similar circumstances would have warned of the danger or instructed on the safe use of their Fluorosurfactant Products.

188.     Defendants' negligent and/or reckless conduct as alleged herein proximately caused Plaintiffs' and Class members' injuries.

189.     Plaintiffs and Class members are, were, and will continue to be harmed by Defendants' negligent and/or reckless conduct alleged herein.

190.     Defendants committed each of the above-described acts and/or omissions knowingly, willfully, and with oppression, fraud, and/or malice. Defendants' acts and/or omissions were performed to promote sales of their Fluorosurfactant Products and with conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and on public health, safety, and welfare.

191.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered, and continue to suffer, monetary damages to be proven at trial.

## SEVENTH CAUSE OF ACTION
### Gross Negligence

192.     Plaintiffs and Class members reallege and reaffirm all allegations set forth in the preceding paragraphs as if fully restated herein.

193.     As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and/or marketers of Fluorosurfactant Products, Defendants owed a duty to

Plaintiffs and Class members, as well as to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, to exercise due care in the designing, instructing, labeling, and warning of the handling, control, use, and disposal of Defendants' Fluorosurfactant Products.

194.    Defendants knew that when used as intended, Defendants' Fluorosurfactant Products would cause contamination of soil and water and would present risks to human and environmental health.

195.    Defendants knew that their Fluorosurfactant Products were dangerous, or likely to be dangerous, when used or misused in a reasonably foreseeable manner.

196.    Defendants knew or reasonably should have known that users and third parties would not realize the danger.

197.    By designing, manufacturing, selling, and/or distributing their Fluorosurfactant Products without adequate warning of toxicity, potential human health risks, and environmental hazards, and without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards, Defendants acted without any or very slight care for the health and safety of others, including Plaintiffs and Class members.

198.    At all times, each Defendant purposely acted with knowledge that its actions would breach its duty not to cause harm to others.

199.    Defendants acted with a conscious disregard for the health and safety of others, including Plaintiffs and Class members.

200.     Plaintiffs and Class members were, are, and will continue to be harmed by Defendants' Fluorosurfactant Products. The injuries suffered by Plaintiffs and Class members are reasonably foreseeable.

201.     Defendants committed each of the above-described acts and/or omissions knowingly, willfully, and with oppression, fraud, and/or malice. Defendants' acts and/or omissions were performed to promote sales of their Fluorosurfactant Products and with conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and on public health, safety, and welfare.

202.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered, and continue to suffer, monetary damages to be proven at trial.

## EIGHTH CAUSE OF ACTION
### Civil Conspiracy

203.     Plaintiffs and Class members reallege and reaffirm all allegations set forth in the preceding paragraphs as if fully restated herein.

204.     At all times relevant to this lawsuit, Defendants actually knew of the hazards that PFAS posed to the environment, including to Plaintiffs' and Class Properties.

205.     Beginning by the 1970s and continuing through the date of the filing of this Complaint, Defendants agreed to engage in unlawful and malicious acts that caused damage to the Plaintiffs. Each Defendant performed at least one overt act in furtherance of this conspiracy. Specifically, Defendants colluded for the avowed purpose of providing information about AFFF products containing PFAS to the public and the government, with the true, unlawful purpose of:

a. intentionally misrepresenting to the EPA and the public that AFFF containing PFAS was safe and did not pose a risk to human health and the environment;

b. concealing the dangers of AFFF containing PFAS, including the products' characteristics and their propensity to contaminate soil and groundwater, from the government and public by, among other means, repeatedly misrepresenting how products containing PFAS were being disposed of;

c. concealing the dangers of PFAS from consumers and the public; and

d. using their considerable resources to fight legislation concerning PFAS .

206.    As a direct and proximate result of Defendants' conspiracy, Defendants' AFFF products at all times relevant to this litigation have:

a. posed and continue to pose a threat to Plaintiffs' Properties;

b. contaminated and will continue to contaminate Plaintiffs' Properties;

c. contaminated and will continue to contaminate the soil, surface and groundwater on and within the vicinity of Plaintiffs' Properties;

d. required and will continue to require testing and monitoring of Plaintiffs' Properties for PFAS contamination;

e. required or will require remediation of PFAS contamination or, where remediation is impracticable or insufficient for Plaintiffs, removal and disposal of the contamination;

f. diminished confidence in, and the use and enjoyment of, Plaintiffs' Properties;

g.  diminished the value of Plaintiffs' Properties due to actual, impending, and/or threatened PFAS contamination; and

h.  caused and/or will cause Plaintiffs to sustain substantially increased damages and expenses resulting from the loss of the safety, use, benefit and/or enjoyment of their Properties.

207.    Defendants committed each of the above-described acts and/or omissions knowingly, willfully, and with oppression, fraud, and/or malice. Defendants' acts and/or omissions were performed to promote sales of their Fluorosurfactant Products and with conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and on public health, safety, and welfare.

208.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered, and continue to suffer, monetary damages to be proven at trial.

## NINTH CAUSE OF ACTION
### Violation of Ohio's Uniform Fraudulent Transfer Act
### (Against UFTA Defendants Only)

209.    Plaintiffs and Class members reallege and reaffirm all allegations set forth in the preceding paragraphs as if fully restated herein.

210.    Plaintiffs and Class members seeks equitable and other relief pursuant to the Ohio Uniform Fraudulent Transfer Act ("UFTA"), ORC Chapter 1336 *et seq*., against Old DuPont, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and New DuPont (collectively, the "UFTA Defendants").

211.    Pursuant to ORC 1336.04(A), "[a] transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before, or

within a reasonable time not to exceed four years after, the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

    a. (1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

    b. (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

        i. (a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

        ii. (b) The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

212. Further, ORC 1336.04(B) states that, "[i]n determining actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, including, but not limited to, [...] whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit; whether the transfer was of substantially all of the assets of the debtor; whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred."

213. By 2013, Old DuPont faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and/or sale of PFAS. In order to shield its assets from these liabilities, Old DuPont engaged in a complex series of corporate restructurings and spin-offs.

214.     In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" division to Chemours.

215.     In or around July 2015, Old DuPont spun-off Chemours as a separate public entity. As part of this transaction, Chemours assumed certain of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFAS and Fluorosurfactant Products and agreed to indemnify Old DuPont against all such liabilities.

216.     Upon information and belief, at the time of the spinoff, Old DuPont's Performance Chemicals division contained the Fluorosurfactant Products and/or PFAS business segments. In addition to the transfer of the Performance Chemicals division, Chemours accepted broad assumption of liabilities for Old DuPont's historical use, manufacture, distribution, and sale of Fluorosurfactant Products and/or PFAS.

217.     Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liability for damages and injuries from the manufacture and sale of its Fluorosurfactant Products.

218.     Upon information and belief, as a result of the transfer of assets and liabilities described in this Complaint, the UFTA Defendants have attempted to limit the availability of assets to cover judgements for all of the liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products described herein.

219.     Upon information and belief, the UFTA Defendants (a) acted with intent to hinder, delay and defraud parties, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

220.     Upon information and belief, the UFTA Defendants engaged in acts in furtherance of a scheme to transfer Old DuPont's assets out of the reach of Plaintiffs, and other similar parties, that have suffered injury and been damaged as a result of the UFTA Defendants' conduct, omissions, and actions as described in this Complaint.

221.     Upon information and belief, UFTA Defendants acted without receiving a reasonably equivalent value in exchange for the transfer of obligations, and Old DuPont knew, or reasonably should have known, that The Chemours Company would incur debts beyond its ability to pay as they became due.

222.     Upon information and belief, as a result of the transfer of assets and liabilities described in this Complaint, the UFTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liabilities for damages and injuries from the manufacturing, marketing, distribution, and/or sale of Fluorosurfactant Products.

223.     Pursuant to ORC 1336 *et seq.*, Plaintiffs seeks to avoid the transfer of Old DuPont's liabilities for the claims brought in this Complaint and to hold the UFTA Defendants jointly and severally liable for any damages or other remedies that may be awarded by this Court or a jury under this Complaint.

224.    Plaintiffs and Class members further reserve such other rights and remedies that may be available to them as may be necessary to fully compensate Plaintiffs and Class members for the damages and injuries Plaintiffs and Class members have suffered as alleged in this Complaint.

## NINTH CAUSE OF ACTION
### Fraudulent Concealment

225.    Plaintiffs and Class members reallege and reaffirm all allegations set forth in the preceding paragraphs as if fully restated herein.

226.    Defendants knowingly concealed material facts, including but not limited to: the toxicity of Fluorosurfactant Products, that Fluorosurfactant Products persist for long periods of time in the environment, and that the use of Fluorosurfactant Products could lead to contamination of nearby groundwater wells.

227.    Defendants concealed these facts while actively promoting the use of their products for uses that would cause water contamination; for example, Defendants' encouraged use of their product when training.

228.    Defendants concealed these facts to allow for continued sale and use of its products.

229.    Defendants intended for their actions to encourage users of their products to use Fluorosurfactant Products in ways that led directly to PFAS entering the environment, including surface water and groundwater.

230.    The users of Defendants' products – including those who used AFFF leading to contamination of Plaintiffs' and Class properties – relied on Defendants various representations.

231.     In addition, Plaintiffs and Class members have relied of Defendants' various representations – including but not limited to representations regarding the toxicity of PFAS.

232.     As a result of Defendants' fraudulent concealment, Plaintiffs and Class members have been harmed.

### PUNITIVE DAMAGES
### Pursuant to Ohio Rev. Code § 2315.21

233.     Under the applicable laws of the State of Ohio, Plaintiffs and Class members seek Punitive damages due to the wanton and willful acts and/or omissions of Defendants as set forth and alleged throughout this Complaint.

### JURY DEMAND

234.     Plaintiffs and Class members demand a jury trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court grant Plaintiff and each Class Member the following relief against Defendants, jointly and severally, as follows:

1.     Certify the Class as requested;

2.     Appoint Plaintiffs to serve as the Class Representatives;

3.     Appoint Brett Land and Andrew Cvitanovic as Lead Class Counsel;

4.     On the First Cause of Action, an award of damages against the Defendants in an amount to be determined at trial, but in no event less than $25,000.00;

5.     On the Second Cause of Action, an award of damages against the Defendants in an amount to be determined at trial, but in no event less than $25,000.00;

6. On the Third Cause of Action, an award of damages against the Defendants in an amount to be determined at trial, but in no event less than $25,000.00;

7. On the Fourth Cause of Action, an award of damages against the Defendants in an amount to be determined at trial, but in no event less than $25,000.00;

8. On the Fifth Cause of Action, an award of damages against the Defendants in an amount to be determined at trial, but in no event less than $25,000.00;

9. On the Sixth Cause of Action, an award of damages against the Defendants in an amount to be determined at trial, but in no event less than $25,000.00;

10. On the Seventh Cause of Action, an award of damages against the Defendants in an amount to be determined at trial, but in no event less than $25,000.00;

11. On the Eighth Cause of Action, an award of damages against the Defendants in an amount to be determined at trial, but in no event less than $25,000.00;

12. On the Ninth Cause of Action, an award of damages against the Defendants in an amount to be determined at trial, but in no event less than $25,000.00;

13. Enter judgment for Plaintiffs and against Defendants for compensatory and punitive damages, all costs and expenses of suit, attorneys' fees, and pre- and post-judgment interest;

14. Order such injunctive and equitable relief as necessary to abate the nuisance caused by Defendants and to prevent continuing injury and damages to Plaintiffs;

15. Establishment of a comprehensive medical monitoring program supervised by the Court; and

16. Order any further relief as the Court deems just, proper, and equitable.

DATED: February 26, 2024

Respectfully submitted,

McNamee Law Group, LLC

By: _____
D. Dale Seif, Jr. (OH Bar 0075924)
2625 Commons Boulevard
Beavercreek, OH 45431
Telephone: (937) 427-1367
Fax: (937) 427-1369
dseif@mcnameelaw.com

Oths, Heiser, Miller, Waigand & Clagg, LLC
Robert R. Miller (OH Bar 0047186)
78 Broadway
Jackson, Ohio 45640
Telephone: (740) 384-2111
Fax: (740) 288-0702
rmiller@ohlaw.com

Cossich, Sumich, Parsiola & Taylor, LLC
Andrew Cvitanovic* (LA Bar 34500)
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000
Fax: (504) 394-9110
andrewcvitanovic@cossichlaw.com
*Application for Pro Hac Vice admission pending

Baron & Budd, P.C.
Brett Land* (TX Bar 24092664)
3102 Oak Lawn Ave.
Suite 1100
Dallas, Texas 75219
Telephone: (214) 523-6206
Fax: (214) 520-1181
bland@baronbudd.com
*Application for Pro Hac Vice admission pending

ATTORNEYS FOR PLAINTIFFS